THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES W. McCRIMMON, Defendant-Appellant.

Second District   No. 2—90—0231

Opinion filed February 28, 1992.

Herbert Hill, of Law Offices of Herbert W. Hill, of Aurora, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Following a bench trial in November 1989, defendant, James W. McCrimmon, in cause No. 85—CF—836, was found guilty of keeping a gambling place (counts I, VI) (Ill. Rev. Stat. 1985, ch. 38, par. 28—3), gambling (count II) (Ill. Rev. Stat. 1985, ch. 38, par. 28—1(a)(3)), aggravated battery (count IV) (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(b)(6)), and unlawful distribution of liquor without a license (Ill. Rev. Stat. 1985, ch. 43, par. 183). In cause No. 88—CF—774, the trial court found defendant guilty of conspiracy to commit gambling (count I) (Ill. Rev. Stat. 1985, ch. 38, pars. 8—2, 28—1(a)(3)). On December 26, 1989, defendant's post-trial motion was denied.

On January 29, 1990, the trial court sentenced defendant to two years' concurrent imprisonment and entered judgment on only two of the charges: aggravated battery and conspiracy to commit gambling. The other findings appear to have been dismissed. Defendant filed this timely appeal.

To the extent that we are able to understand the contentions of error raised in his brief, defendant argues that (1) he was not proved guilty beyond a reasonable doubt of the conspiracy (gambling) offense; (2) the trial court erred in allowing the complaining officer's testi-

mony concerning the aggravated battery allegedly committed against him; and (3) defendant was not proved guilty beyond a reasonable doubt of the aggravated battery. We affirm.

We recite only those facts necessary to an understanding of the issues on appeal. Because of the incomplete and argumentative nature of defendant's statement of facts, we are guided by the State's version of the facts. At trial, Thomas J. Tichy of the Will County sheriff's department stated that, in October 1985, he was working as an undercover agent for the Kane County sheriff's department. At 11:45 p.m. on October 11, 1985, he went to a bar in Aurora called John's B & B. Defendant was the target of his investigation. At the bar, he overheard defendant, who was engaged in a conversation with James Potts. Potts asked defendant how his business was doing and how his craps table was holding up. Defendant said it was fine and that he needed to get some new dice. Defendant noted that there seemed to be a pretty good crowd at John's that night and he would probably have a pretty good crowd that night at his place also. Defendant said he had to leave to go open up his place, and he left John's.

Tichy stayed awhile longer and struck up a conversation with three women at the bar. He left with them to go to an establishment at 720 Terry Avenue in Aurora, Illinois, the location of the alleged after-hours bar and gambling operation. When Tichy arrived at about 2 a.m., he observed about 20 or 30 cars there. He saw defendant standing in the parking area, directing cars with a flashlight and leading them to parking spaces. Tichy went into the building. At the entrance was a black male named John Cooper, described in other testimony as defendant's friend and helper. Cooper was taking a $1 cover charge from each person entering the building. Tichy paid for himself and the three women, and they entered the bar.

Tichy and the women entered a large area where there was a bar. The bar had just opened and there were several people milling around. The person behind the bar asked Tichy if he wanted a drink. He ordered two beers and a mixed drink and paid for them. Within a short time, the bar became crowded. Tichy estimated there were a hundred people there. Cooper then walked up and down the front bar area and announced that the craps table was now open. Tichy followed him to a small room with several other patrons. Tichy observed what looked like a pool table that had been converted to a craps table. Cooper explained the house rules. A game of dice ensued in which participants, including Tichy, put money down on the table and bet on the outcome of the roll of the dice. Based on his training and experience, Tichy stated that gambling had taken place.

Tichy then proceeded to a round table where there was card playing involving money. There was a $1 ante, and there was a substantial amount of money on the table including $5, $10, and $20 bills. Tichy was asked to and did participate in the game in which he bet on the outcome of the cards dealt. Some players won at poker, although Tichy lost some money in the game. He testified that, in his opinion, gambling had taken place. Tichy left the bar at approximately 3:30 a.m.

Tichy further testified that he returned to this location at about 2 a.m. the next day, October 13, 1985. Defense counsel objected to this testimony on the basis of his prior motion to suppress certain evidence as the fruits of an improper entry into the building at 5:39 a.m. that morning by Robert Orta, a Kane County deputy sheriff. Defendant's earlier motion to suppress was sustained by the trial court and on appeal (*People v. McCrimmon* (2d Dist. 1987), No. 2—86—0621 (unpublished order under Supreme Court Rule 23)). The trial court denied defendant's objection to Tichy's testimony as outside the scope of that prior ruling. Tichy testified that, as he approached the building at 720 Terry Avenue, he observed defendant and Cooper standing and conversing at the doorway. As Tichy went to enter the door, Cooper asked once again for a $1 cover charge. Tichy paid the charge, and Cooper marked his hand with a black marker.

After Tichy entered, he bought some alcoholic beverages for himself and the two women with him. He handed drinks to the women. He walked into the room where there was a craps game in progress. He noticed that Cooper was present. Tichy again bet in the dice game. Cooper put some of the money in his pocket and some in a can. When Tichy won, Cooper paid him the winnings. Tichy again opined that he observed gambling. Tichy also participated and bet in a card game involving substantial amounts of money. The ante was $1. A winner would receive a portion of the amount of money in the center of the table. Tichy also observed that the bar was crowded and the cigarette smoke was such that it burned his eyes.

Tichy left the building between 4:15 and 4:45 a.m. When he exited, he met defendant, who was still standing outside near the doorway. A woman who was with Tichy introduced defendant as her uncle. Tichy complimented defendant on running a fine after-hours bar and gambling room. Defendant replied, "Thanks, come again." When Tichy commented on the problem with the smoke in the building, defendant said he had forgotten to turn on the exhaust fan and he had just sent someone to do that.

Kurt J. Keroson, an auto body mechanic who worked at a shop also located at 720 Terry Avenue, testified that he paid rent to Stanley Burton whom he described as the manager of the property. Keroson observed defendant move into the unit next to his in August or September 1985. Defendant did some painting and electrical work and installed an exhaust fan during a two-week period. Defendant introduced Cooper to him as a friend and helper. Keroson observed Cooper working on the premises.

Stanley Burton testified that he had an auto body shop at the same location in 1985. He collected the rent for the landlord when he was out of town. Burton showed the property to defendant, who rented it for $375 per month. Defendant introduced Cooper to Burton, who saw them make repairs, install an exhaust fan and build a bar. Burton saw Jim Adamson build the bar. Defendant told Burton of his intent to have private parties. Defendant also mentioned his intent to obtain a license to run a private club.

Paul Jacobs testified that he did auto body work and did some overflow work for Stanley Burton. On one occasion, he went to 720 Terry Avenue to pick up a truck and noticed defendant moving some items, including chairs and a box with alcohol, into the front part of the building. After closing time, at about 2 a.m., Jacobs left John's B & B in Aurora on October 13, 1985. He went to the bar at 720 Terry Avenue where he stayed for about two hours. He saw other people drinking and socializing. Others were playing cards, and there was United States currency on the table. He purchased drinks at the bar for $1 each. In the back room, there was a table with built-up sides on it. The building had been furnished with a bar, picnic tables and a jukebox whereas it had been bare six months before.

Jim Adamson testified that he helped defendant build a counter at defendant's house with the help of Cooper. Adamson helped assemble the counter at "the other place," an empty building near Jericho Road.

Joan Keasler testified that she was an employee of the county board office and had access to the records of the Kane County Liquor Commission. Her review of the records showed that no liquor license was ever issued to defendant.

Kane County deputy sheriff Robert Orta testified regarding his arrival at 720 Terry Avenue at about 5:39 a.m. on October 13, 1985. Defense counsel orally moved to bar Orta's testimony regarding his observations upon arriving at the premises because of this court's 1987 decision (*McCrimmon*, No. 2—86—0621) affirming the trial court's suppression of certain evidence seized upon the warrantless

entry into the premises. Orta had responded to a false report by Sergeant Kenneth Ramsey of the Kane County sheriff's department regarding a disturbance or fight in progress at the Terry Avenue address. The trial court ruled that Orta could testify regarding the alleged battery to his person and that such testimony was not barred or suppressed by this court's ruling.

Deputy Orta testified that when he arrived at 720 Terry Avenue at 5:39 a.m. in his marked squad car, he observed 35 to 40 people in the parking areas yelling, screaming, creating a disturbance, drinking and being loud. Orta was dressed in a police uniform, and he carried a firearm. He exited his vehicle and saw defendant outside the building. As Orta came within arm's reach of defendant, defendant launched a verbal barrage at him, including numerous obscenities. Defendant said that it was his place, that Orta did not have a warrant and that Orta did not belong there. As Orta approached the door where defendant was standing, Orta advised defendant that he was there to investigate a report of a fight in progress. Defendant grabbed Orta by the arms and threw Orta into the doorjamb or side of the building so that the back of Orta's left shoulder made contact with the building. Orta stated that he immediately felt pain in his shoulder. Orta missed the next day of work as a result and sustained pain for up to a month. Orta said that he had not taken any threatening action toward defendant.

When Orta again attempted to enter the building to investigate, defendant pushed him back in the chest area. Defendant then pushed the deputy sheriff a third time.

On cross-examination, Orta acknowledged that he did not see a fight in progress as had been reported to him by a radio dispatch. Defendant threatened to sue Orta, who acknowledged in his testimony that defendant had sued him before. Although Orta engaged in power weightlifting, he testified that he feared defendant. Orta also stated that he did not draw his weapon on this particular occasion.

Theresa A. Gillis, who lived with defendant, testified in his behalf. She stated that she went bowling with defendant on Saturday, October 12, 1985, and had spent the day with him. They came home that night, probably between 11:30 p.m. and midnight, and did not stop at John's B & B. She knew Jim Adamson as "Jimbo," and he had built a bar for their home. Gillis claimed that she and defendant rented a stall in September 1985 at 720 Terry Avenue to store a motor home there, but the space was too small and the motor home stuck out of the front door. They only got part of their money back.

On cross-examination, Gillis acknowledged that defendant left the house alone after they got home and that he was arrested in the morning of October 13, 1985.

Defendant testified that on the evening of October 11, 1985, and around midnight, he was not at John's B & B in Aurora. He denied seeing Jimmy Potts on October 11 or 12, 1985, or having a conversation with him regarding the Terry Avenue operation. He said he was present at that location on October 13, 1985, because he had been invited by Stan Burton and John Cooper to a party there for a bartender. He did not pay any money to get in. He denied owning or renting the place and claimed to have no relationship to the place at all. He denied making any improvements to the building. He stated that Adamson did build a countertop for his home in 1985, but that it was never transported to 720 Terry Avenue. Defendant denied having any conversation with Tichy. Defendant stated that he rented property from Burton at 720 Terry Avenue to store a motor home but it did not fit and he tried to get his money back. He denied continuing to rent the property or operating a business there.

Defendant denied being at 720 Terry Avenue on October 12, 1985, but admitted being there the following day. On October 13, 1985, defendant was outside at the end of the walkway and was ready to go home at about 5:30 a.m. He saw Orta driving right at him, and Orta stopped four or five feet in front of him. According to defendant, Orta came "swinging out of the squad car" and straight at defendant. When Orta got close, he gave defendant a big push back to the door. Defendant denied touching, swinging at or grabbing Orta or pushing him into the wall. Defendant denied swearing at Orta or attempting to stop him from entering the building. Defendant had known Orta since 1981 and admitted that he had filed a prior lawsuit against him. Defendant testified that Orta's reputation for violence was bad. Defendant denied telling Orta that Orta had no right to be on the property and denied asking him why he was there or whether he had a warrant.

On cross-examination, the State attempted to impeach defendant with his prior testimony elicited during the suppression hearing when defendant said he asked Orta why he was there and whether he had a warrant. Defendant said he did not remember that testimony. Defendant did remember saying to Orta that it was "his picnic." Defendant admitted that he did not have a liquor license. He also admitted that he knew Orta was a police officer. Defendant said he had been at 720 Terry Avenue only once before—sometime in September. He believed

that Keroson, Adamson, and Burton were lying when they stated that he was there on prior occasions.

On appeal, defendant first argues, in a conclusory fashion, that he was not found guilty beyond a reasonable doubt of any gambling offense because there was no evidence connecting him with the gambling enterprise, particularly in regard to his control or acquiescence in the enterprise. Defendant fails to support his argument regarding the State's alleged failure to prove any of the elements of the offenses with sufficient citation to the record or to pertinent authority. Defendant leaves it for this court to search the record for error, a task which this court is not required to perform. On appeal, defendant has the burden of presenting each issue in a clearly defined manner with citations to the pertinent authority and to the record or risk waiver of the issue. (See *People v. Trimble* (1989), 181 Ill. App. 3d 355, 356-57; *People v. Isbell* (1988), 177 Ill. App. 3d 854, 864.) Accordingly, defendant's first argument is waived.

Even if we were to consider the merits of his first argument, our review of the evidence persuades us that the State presented sufficient evidence for the trier of fact to find defendant guilty beyond a reasonable doubt of the offense of conspiracy to commit gambling. The relevant question on review is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 44.) A person commits gambling when he "[o]perates, keeps, owns, uses, purchases, exhibits, rents, sells, bargains for the sale or lease of, manufactures or distributes any gambling device." (Ill. Rev. Stat. 1985, ch. 38, par. 28—1(a)(3); see *People v. Agriesti* (1989), 191 Ill. App. 3d 419, 423.) A person commits conspiracy when, with the intent that an offense be committed, he agrees with another to the commission of that offense and commits an act in furtherance of such an agreement. Ill. Rev. Stat. 1985, ch. 38, par. 8—2; see *Agriesti*, 191 Ill. App. 3d at 423.

■ We have recited at length the testimony of the witnesses at trial, and we believe that a lengthy commentary on the evidence is not called for here. We conclude that Tichy's testimony regarding the gambling operation and the role of defendant together with that of corroborating witnesses is sufficient to sustain the conviction. Before and after his visit to the enterprise, Tichy overheard defendant's admissions concerning his after-hours operation: that he would have a "good crowd," that his business was "holding up," and that he needed to get new dice. Additionally, defendant acknowledged to

Tichy that he had problems with cigarette smoke in the unit and accepted a compliment that he had a fine after-hours bar and gambling room. Tichy observed defendant directing cars and patrons at the establishment. Tichy participated in gambling on the premises.

Other witnesses testified that defendant rented the premises and worked with his helper, Cooper, in remodeling the premises. There was evidence that defendant was an active participant in operating, keeping, owning, using, or exhibiting a gambling device. It was shown that Cooper was actively running the games and accepting money. From the totality of the facts, it can be reasonably inferred that there was an agreement between Cooper and defendant to act intentionally in furtherance of the gambling operation.

Defendant next argues that the trial court erred by denying his oral motion to exclude Orta's testimony regarding the aggravated battery. In the trial court and on appeal, defendant has relied on this court's 1987 order (*McCrimmon*, No. 2—86—0621) affirming the suppression of evidence seized or obtained as a result of the warrantless entry into the building. Our order did not, however, pass on the propriety of suppressing evidence of the aggravated battery which took place in an area outside the building, apparently open to the public, and prior to the entry.

■ The fourth amendment protection against unreasonable governmental searches and seizures extends to individuals who have a reasonable expectation of privacy in the place searched or the property seized (see *People v. Johnson* (1986), 114 Ill. 2d 170, 191), and the proponent of a motion to suppress bears the burden of proving a legitimate expectation of privacy (*People v. Sutherland* (1980), 92 Ill. App. 3d 338, 342). The initial burden of proving an unlawful search and seizure is on the defendant. (*People v. Douglas* (1980), 86 Ill. App. 3d 668, 670-71.) Defendant has not properly made a showing, either here or below, that Deputy Orta's initial approach toward him, in a place apparently open to the public and prior to Orta's entry into the building, violated his expectation of privacy or constituted an unlawful search or seizure.

Even if we assume, *arguendo*, that Orta's presence on the property outside the building was unlawful from its inception, it does not necessarily follow that Orta's observations of an alleged aggravated battery upon him must be excluded or suppressed. In *People v. Abrams* (1971), 48 Ill. 2d 446, 456, our supreme court refused to extend the exclusionary rule to suppress evidence of a defendant's unlawful conduct, such as homicide or assault, in reaction to an illegal search. The court reasoned that to countenance, through the use of

the exclusionary rule, what can be regarded as an unlawful species of self-help would be to encourage unlawful and retaliatory conduct. (Accord *People v. Klimek* (1981), 101 Ill. App. 3d 1, 7.) We note that other jurisdictions have reached a similar result. See, *e.g., Commonwealth v. Saia* (1977), 372 Mass. 53, 360 N.E.2d 329; *State v. Aydelotte* (1983), 35 Wash. App. 125, 665 P.2d 443; see also 4 W. LaFave, Search & Seizure §11.4(j) (2d ed. 1987) (and cases cited therein).

One reason for this limitation on the reach of the exclusionary rule is that the acts of the defendant may be deemed criminal acts which are *independent* of the improper search or seizure. (See *Abrams*, 48 Ill. 2d at 456-57.) Even if one assumes the illegality of the entry, there is no "exploitation" of the primary illegality. The rationale for the exclusionary rule does not justify the extension of the rule to this extreme. Otherwise, blind application of the exclusionary rule would give victims of fourth amendment violations a license to attack violently or even murder the officers involved with impunity—a result that is manifestly unacceptable. See 4 W. LaFave, Search & Seizure §11.4(j), at 460 (2d ed. 1987); *Saia*, 372 Mass. at 62, 360 N.E.2d at 332.

We agree with the *Saia* court's reasoning that there is no simplistic "but for" analysis in this area of law. This is not a case where the illegal entry leads to the seizure of the evidence which produces an admission by defendant, nor is it a case where the illegal entry gives an officer knowledge of a prior or ongoing criminal activity. Instead, defendant argues that the trial court erred by not suppressing evidence of his battery of Deputy Orta, an incident that we believe was wholly independent of the later, albeit improper, search of the premises. The exclusionary rule does not reach this far. We believe that a just result can best be achieved by allowing the presentation of such evidence, if that evidence is otherwise admissible. (See *Saia*, 372 Mass. at 62, 360 N.E.2d at 332; *Aydelotte*, 35 Wash. App. at 133-34, 665 P.2d at 448.) In view of the foregoing analysis, we conclude that the trial court properly denied defendant's oral motion to exclude the testimony of Orta.

■ Intertwined with his argument regarding the exclusionary rule, defendant attempts to raise, in a cursory manner, a defense of legal justification. A defendant has the burden of presenting to the trial court any affirmative defense that he may have, such as legal justification. (*Abrams*, 48 Ill. 2d at 458; *People v. Mills* (1978), 58 Ill. App. 3d 300, 303.) In the case at bar, defendant testified at trial that he did not attack the officer and that it was the officer who acted aggressively.

In his closing argument, defendant emphasized the improbability of his attacking the officer. His defense was that he did not do it. He did not argue that his attack on the officer was justified. We do not have the benefit of a report of the proceedings of the hearing on his post-trial motion. We note, however, that in his written post-trial motion he did not affirmatively argue the defense of legal justification which he is now attempting to raise for the first time on appeal. This argument is therefore waived. *Abrams*, 48 Ill. 2d at 458.

■ Finally, defendant argues that there was no proof that Deputy Orta suffered any harm because Orta was a weightlifter. To the contrary, Orta testified that he was slammed against the building, that his shoulder hurt, that he felt pain and that he took the next day off from work. We believe this was sufficient evidence to show that Orta suffered bodily harm. (See *People v. Rotuno* (1987), 156 Ill. App. 3d 989, 993.) We conclude that defendant has failed to raise a reasonable doubt of his guilt as to either the aggravated battery conviction or the conspiracy to commit gambling conviction.

For the reasons stated, we affirm the judgment of the circuit court.

Affirmed.

BOWMAN and WOODWARD, JJ., concur.