[Nos. 14810-6-III; 14811-4-III. Division Three. August 21, 1997.]

THE STATE OF WASHINGTON, *Respondent,* v. PHILIP R. McKINLAY, *Appellant.*

*Mark C. Prothero* and *Nash & Prothero*, for appellant.

*Thomas A. Metzger, Prosecuting Attorney,* and *Antonio D. Koures, Deputy,* for respondent.

BROWN, J. — Philip R. McKinlay appeals his controlled substance convictions. The issue is whether the trial court erred in not suppressing evidence seized as a result of a warrant authorizing a search for evidence of Mr. McKinlay's display of a weapon in a threatening manner toward a low-flying helicopter engaged in aerial surveillance of his property. We affirm.

## FACTS

On October 5, 1994 in Pend Oreille County, Deputy Steven Groom and a civilian pilot, Jim, in an unmarked helicopter conducted an aerial surveillance of about 25 properties, including one belonging to Mr. McKinlay, looking for evidence of controlled substance violations. Deputy

Groom knew and was able to recognize Mr. McKinlay from a previous indoor marijuana grow operation arrest.

According to Mr. McKinlay, the helicopter flying by his property was probably 200 feet at its lowest point vertically and 800 feet horizontally from his position on the property. The parties stipulated the pilot would testify to not less than 300 feet vertically at its lowest point for the purposes of the suppression hearing.[1] Mr. McKinlay said his position on the property at the time of the flyby was between his pickup truck and the house. He placed the truck a maximum of 15 feet from the house and his position 10 feet from the steps of his front porch on the driveway at the end of his sidewalk. Deputy Groom placed Mr. McKinlay's position on the property as "standing out [in] his yard area to the side of his residence . . . somewhere between 40 and 60 feet away from his front door."

When Mr. McKinlay became aware of the helicopter's presence, he concedes he ran to the truck, retrieved his gun, and "held it up to the helicopter." The parties, however, disputed whether he was actually pointing the gun at the helicopter. Believing that he had witnessed a violation of RCW 9.41.270[2] relating to the unlawful handling of a firearm, Deputy Groom applied for and received a search warrant on October 12, 1994.

---

[1]Mr. McKinlay testified to an earlier incident where he claimed a helicopter hovered over his property on October 1, 1994. The government disclaimed any knowledge of this earlier alleged incident at the suppression hearing. The trial court concluded that it was a different helicopter. Mr. McKinlay's claim on October 5, 1994 is that he heard a helicopter flying by, and having the earlier incident in mind, he wanted to display his gun in order to show his willingness to protect his view of his First Amendment rights. When the helicopter flew by, Mr. McKinlay related, "After he became (sic) in sight of me that is when he took off in an erratic manner. And that's the last I saw (of him)."

[2]RCW 9.41.270 states in relevant part:

"(1) It shall be unlawful for any person to carry, exhibit, display, or draw any firearm . . . in a manner, under circumstances, and at a time and place that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons.

". . . .

"(3) Subsection (1) of this section shall not apply to or affect the following:

"(a) Any act committed by a person while in his or her place of abode. . . ."

Deputy Groom's affidavit in support of the first warrant stated in part the following circumstances supporting probable cause:

Today as we made a pass-over and a circle around the property of (Mr. McKinlay), I saw a male with leg braces exit the house, stand in the front yard and point a hand gun directly at us. The helicopter was making a left-hand circle with my seat position closest to the ground. I could articulate that I saw the man I had once before arrested, Philip McKinlay, standing in the yard with his arm extended toward us. As the helicopter passed over him, I saw his arm follow the helicopter in an aiming position. When I noticed this, I told the pilot "GUN, get the hell out of here." I thought we were going to be shot at. Jim flew the helicopter away from the property to safety. . . . Our altitude at the time of the gun being pointed at us was approximately 500 feet or less.

Officers executed the warrant at Mr. McKinlay's residence on October 15. During the search, the officers discovered a pistol and also a marijuana grow operation. Execution of a second search warrant, for the grow operation, obtained on October 15, resulted in the seizure of the controlled substance evidence.

Mr. McKinlay was charged with two violations of RCW 69.50.401(a)(1), the first Manufacture and the second Possession of a Controlled Substance (Marijuana) with Intent to Deliver on or about October 15, 1994. The charges were tried together without objection.

The court denied Mr. McKinlay's motion to suppress the evidence seized on October 15. For reasons not apparent in the record, the trial court did not enter findings of fact or conclusions of law.

The court's oral decision, however, included the following: (1) the October 5, 1994 event was a "fly-over"; (2) "the altitude was as low as 300 feet and possibly higher"; (3) there was "no illegal intrusion"; (4) "the helicopter and the people within it could not be identified as police offic-

ers";[3] (5) the first search warrant was not obtained for the purpose of a pretext search; (6) Mr. McKinlay was in his yard which was part of the area immediately around the house and thus part of the curtilage; and (7) the curtilage was within the meaning of "abode" triggering the exclusion of RCW 9.41.270(3)(a).

The trial court concluded that even if the exclusion applied and there could be no successful prosecution under RCW 9.41.270, it would not be dispositive of the suppression issue because the affidavit of Deputy Groom stated sufficient facts to support the issuance of the warrant based upon the assaultive display of the firearm.

A jury convicted Mr. McKinlay on both counts. Mr. McKinlay appeals his convictions challenging the validity of the firearms search warrant. He contends, first, that the warrant was invalid because the aerial surveillance was an unreasonable intrusion into his private affairs and, second, that his display of the handgun was lawful under the circumstances. The second issue is dispositive.

## FIREARM ISSUE ANALYSIS

■ Evidence of Mr. McKinlay's use of a firearm to intimidate or assault those conducting the aerial surveillance is not subject to the exclusionary rule. *See State v. Mierz*, 127 Wn.2d 460, 901 P.2d 286 (1995). When an individual assaults a police officer whose intrusion allegedly violates Fourth Amendment protections, evidence of the assault is outside the scope of the exclusionary rule. *Mierz*, 127 Wn.2d at 471-75. A contrary rule would allow one who was subject to an illegal search to respond with unlimited force and be immunized from prosecution. *State v. Aydelotte*, 35 Wn. App. 125, 132, 665 P.2d 443 (1983). Even an illegal law enforcement entry would not justify

[3]Although Mr. McKinlay denied he knew who was in the unmarked helicopter, since his claim is centered on prevention of what he believed to be an unlawful governmental intrusion into his private affairs, it is reasonable to be inferred from this that his actions were in reference to a law enforcement surveillance.

assaultive conduct by an accused against a police officer unless a traditional self-defense analysis is possible. "Given the complexity and nuance of Fourth Amendment law, in many cases the law enforcement officer and the citizen may both have sincere or reasonable beliefs about the lawfulness of the entry or arrest. Encouraging citizens to test their beliefs through force simply returns us to a system of trial by combat. The proper location for dealing with such issues in a civilized society is in a court of law." *Mierz*, 127 Wn.2d at 475. This reasoning applies equally under article I, section 7 of the Washington State Constitution. The trial court did not err in denying the suppression motion.[4]

## AERIAL SURVEILLANCE ISSUE

Mr. McKinlay's first contention that there was an unreasonable governmental intrusion into his private affairs does not need discussion because of our decision regarding the firearms issue.

## ABSENCE OF FINDINGS AND CONCLUSIONS

The absence of written findings and conclusions was not raised by the parties. Mr. McKinlay raises no issue of prejudice. This appellate review has been complicated by this absence and the State is reminded that this omission remains sanctionable conduct. Because it has not been raised as an issue and has not prejudiced the defendant, we choose not to impose sanctions. The trial court's oral findings are sufficient to permit appellate review of the critical issues. *State v. Riley*, 69 Wn. App. 349, 353, 848 P.2d 1288 (1993).

## CONCLUSION

The trial court ruled correctly in not suppressing the

---

[4]There was no prosecution for a violation of RCW 9.41.270. It is unnecessary to decide whether the terms "curtilage" and "abode" are synonymous for the purpose of determining whether the exclusion of RCW 9.41.270(3)(a) applies to prevent prosecution for the firearms offense.

evidence seized as a result of the search warrant granted to look for evidence of Mr. McKinlay's display of a weapon in a threatening manner toward a low-flying helicopter engaged in aerial surveillance of his property.

The trial court is affirmed.

KURTZ, J., concurs.

SCHULTHEIS, A.C.J. (dissenting) — Today the majority relies on the rule announced in *Mierz* that evidence of a defendant's assaultive behavior toward a police officer is not subject to the exclusionary rule. *State v. Mierz*, 127 Wn.2d 460, 473-75, 901 P.2d 286 (1995). The real issue is whether there is evidence in this case to support application of *Mierz*. Because I find that nothing in the record indicates Mr. McKinlay knew the man in the unmarked helicopter was a police officer, I find *Mierz* distinguishable and respectfully dissent.

Evidence obtained as the result of an illegal search and seizure may be admissible if an independent act of the defendant intervenes to purge the taint of the initial police illegality. *Mierz*, 127 Wn.2d at 473-74. The rationale behind the rule in *Mierz* and similar cases is that excluding such evidence would allow one whose article I, section 7 or Fourth Amendment rights were violated to " 'respond with unlimited force and, under the exclusionary rule, . . . be effectively immunized from criminal responsibility.' " 127 Wn.2d at 474 (quoting *State v. Aydelotte*, 35 Wn. App. 125, 132, 665 P.2d 443 (1983)). As the court noted, "[a]n identified law enforcement officer who oversteps constitutional bounds, without any threat of deadly harm to a defendant or exploitation of his or her position, should not have to pay the ultimate price." *Mierz*, 127 Wn.2d at 475.

But the *Mierz* rule is not applicable where, as here, a defendant is accosted by an unidentified, threatening officer and the defendant responds in self-defense.

In Washington, the exclusionary rule is more than a remedial measure for Fourth Amendment violations; the

historical emphasis of the rule "is on protecting personal rights rather than on curbing governmental actions." *State v. White*, 97 Wn.2d 92, 110, 640 P.2d 1061 (1982). The State may not exploit its own illegalities to obtain evidence. *State v. Gunkel*, 188 Wash. 528, 534, 63 P.2d 376 (1936). *See also Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). "It is possible . . . that the nature of a particular Fourth Amendment violation will be such that defensive action by the [suspect] can fairly be characterized as exploitation . . . ." 5 WAYNE R. LAFAVE, SEARCH & SEIZURE, § 11.4(j), at 340 (3d ed. 1996).

An armed response to an intruder is a predictable response, recognized in such cases as *People v. Cantor*, 36 N.Y.2d 106, 324 N.E.2d 872, 365 N.Y.S.2d 509 (1975) and *United States v. Ramirez*, 91 F.3d 1297 (9th Cir. 1996), *rev'd*, 118 S. Ct. 992 (1998). In *Cantor*, the defendant was in front of his home when three plainclothes police officers surrounded him. The officers did not identify themselves, and Mr. Cantor responded by pulling a pistol out of his pocket. He replaced the pistol in his pocket and surrendered peacefully after the officers identified themselves, but he was arrested and charged with attempted possession of a weapon. The New York Court of Appeals ruled that evidence of the gun should have been suppressed because it "was revealed as a direct consequence of the illegal nature of the stop." *Cantor*, 365 N.Y.S.2d at 517.

The key issue is "whether the gun was displayed as a direct consequence of the allegedly unlawful police action, or whether the gun was revealed as a result of defendant's independent act." *People ex rel. Gonzalez v. Warden of Anna M. Cross Ctr.*, 79 N.Y.2d 892, 590 N.E.2d 234, 581 N.Y.S.2d 649, 651 (1992). Crucial to this determination is the fact that unidentified, somewhat threatening people are likely to trigger an armed response. *Id.*

Here, the officer did not identify himself when he intruded on Mr. McKinlay's expectation of privacy in his

home and curtilage. The altitude of the helicopter and the fact that it was the second incident in a week made the intrusion threatening and disturbing. Mr. McKinlay's display of the firearm was not unpredictable under the circumstances. His crime did not intervene; it was "brought to light by the intrusion itself." *Ramirez*, 91 F.3d at 1304.

In summary, the exception to the exclusionary rule articulated in *Mierz* is inapplicable under the facts of this case and, accordingly, is not dispositive. I would reach the issue of whether the aerial surveillance was unreasonable and reverse.

Review denied at 134 Wn.2d 1014 (1998).